ORDERED SEALED BY COURT

unsealed
on 4/18/08
py

AO106 (Rev. 12/03)  Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

SOUTHERN _____ **DISTRICT OF** CALIFORNIA

FILED

08 MAR -5 PM 5: 09

In the Matter of the Search of

(Name, address or brief description of person, property or premises to be searched)

WHITE CROSS DRUG STORE
4074 Fairmont Avenue
San Diego, CA

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

Case Number:  **'08 MJ 0694**

I, Special Agent Gerald K. Cook _____ being duly sworn depose and say:

I am a(n) Special Agent of the Federal Bureau of Investigation _____ and have reason to believe

Official Title

that ☐ on the person of or ☑ on the property or premises known as (name, description and/or location)

See Attachment A.

in the SOUTHERN _____ District of CALIFORNIA _____

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B.

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

Evidence of a crime and property used in committing a crime; contraband, fruits of a crime, and things criminally possessed; and propery designed or intended for use or which is or has been used as a means of committing a criminal offense.

concerning a violation of Title  21 / 18 _____ United States code, Section(s) __841(a)(1), 843(b) and 846 / 1956__

The facts to support a finding of probable cause are as follows:

See the attached Affidavit of Special Agent Gerald K. Cook

Continued on the attached sheet and made a part hereof: ☑ Yes ☐ No

_____
Signature of Affiant

Sworn to before me and subscribed in my presence,

March 5 , 2008          at   San Diego, California
Date                                                    City                                    State

Hon. Cathy Ann Bencivengo    U.S. Magistrate Judge       _____
Name of Judge          Title of Judge                    Signature of Judge

## ATTACHMENT A

### DESCRIPTION OF PROPERTY TO BE SEARCHED

The premises known as the White Cross Drug Store is located at 4074, Fairmount Avenue, San Diego, California. The premises is a multi-story, free-standing, yellow colored stucco structure. The main entrance is on the south side of the structure and consists of glass double doors above which are the words "PHARMACY ENTRANCE" in white lettering. The name "WHITE CROSS DRUG STORE" is visible in large red letters on the east side of the premises, facing Fairmount Avenue. The numerals "4074" are visible on the east side of the premises, facing Fairmount Avenue.

The search shall include all rooms, attics, crawl spaces, safes, briefcases, storage areas, containers, garages, sheds, carports, storage facilities and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, and trash cans.

# **ATTACHMENT B**

## **ITEMS TO BE SEIZED**

1. Records and documents relating to the purchase, dispensation, administration, prescription or distribution of controlled substances required to be maintained pursuant to Title 21, C.F.R., Section 1302 et seq.

2. Documents containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances, including buyer lists, seller lists, pay-owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

3. Prescriptions;

4. Patient information, files, records and ledgers reflecting any corresponding medical purpose for said prescriptions;

5. Documents containing data reflecting or memorializing prescriptions for controlled substances.

6. Documents containing data reflecting or memorializing billing to health care benefit programs, or payment for health care benefits received from, or associated with, health care benefit programs, including communications to, or received from, health care benefit programs.

7. Employee records including time sheets, employment history records, salary or wage records, and records or data memorializing access to the premises by employees or other persons.

8. Documents or other records memorializing communications between   employees, customers suppliers or others persons associated with the operation or ownership of the premises.

9. Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephone, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, personal identification documents and documents relating to obtaining false identification including birth certificates, drivers license, immigration cards and other forms of identification which the same would use other names and identities other than his or her own.

10. Photographs and video and audio recordings which document persons occupying, possessing, residing in, frequenting, or controlling the premises or which document an association with other coconspirators and/or which display narcotics, firearms, or money and proceeds from narcotics transactions.

11. Packages and contents that were delivered to the premises, or were about to be sent by the occupants.

12. Devices, supplies, equipment or items used in, or the product of, the re-packaging of pharmaceuticals, to include empty tablet containers, caps, seals, bottle labeling devices, seal presses, and pharmaceutical bottles bearing indications of tampering.

13. Shipping and receiving documents relating to the delivery of packages.

1

14.  Banking and financial institution records, bank statements, credit card statements, canceled checks, money orders, deposit slips, orders for or receipt of money transfer by wire, checking and saving books, financial institution statements, safe deposit boxes, loan statements, tax returns, business and personal ledgers, and accounting records.

15.  Records relating to the lease of storage lockers, telephone/address directories and other papers containing telephone numbers and addresses.

16.  Records related to the purchase of real estate, vehicles, precious metals, jewelry and other tangible assets.

17.  Digital storage devices including: floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magnet optical cartridges, personal digital assistance, pagers, money chips, thumb drives, jump drives, flash drives, portable hard drives and computers containing hard drives. All electronic devices, such as computers, which include the central processing units, internal and external devices, internal and external storage equipment or media, terminals or video display units, together with peripheral equipment, such as keyboards, printers, modems, and programmable telephone dialing devices, and operating system software, program software, applications software, manuals for the software and hardware, electronic organizers, or personal digital assistants and computer discs and CD's, cellular telephones and SIM cards. All seized computers shall be returned to the defendants or the defendant's agent within 10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the Government will seek from the Court an extension of time within which to return the applicable devices and/or equipment.

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

**UNITED STATES OF AMERICA**                    )
                                                )    SS
**SOUTHERN DISTRICT OF CALIFORNIA**             )

I, Gerald K. Cook, being duly sworn, hereby depose and say:

1.      I make this affidavit in support of an application for a search warrant in furtherance of an investigation conducted by special agents of the Federal Bureau of Investigation ("FBI") for the premises known as the WHITE CROSS DRUG STORE located at 4074, Fairmount Avenue, San Diego, California, (hereafter sometimes referred to "the target location"). The target location is described further in Attachment A.

2.      As discussed further, AHMAD H. HNAINO, the Pharmacist-in-Charge at WHITE CROSS DRUG STORE has illegally distributed pharmaceuticals, including oxycodone[1] and hydrocodone bitartrate,[2] to individuals without a medical prescription since at least September 2007. On March 5, 2007, a complaint was filed in the United States District Court for the Southern District of California, Case No. 08MJ0667,  charging HNAINO with distribution of oxycodone and hydrocodone bitartrate in violation of 21 U.S.C. § 841(a)(1).

3.      The purpose of the search warrant is to seize (1) property that constitutes evidence of the commission of controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and money laundering offenses under 18 U.S.C. § 1956, (2) contraband, fruits of crime or things otherwise criminally possessed, and (3) property designed or intended for use, or which is or has been used, as a means of committing a criminal offense.

4.      The information contained in this affidavit is based on my personal experience and training, consultation with other special agents of the FBI, the Drug Enforcement Administration ("DEA"), the Criminal Investigation Division of the Internal Revenue Service ("IRS"), officers of the

---

[1] Oxycodone is a potent and potentially addictive opioid analgesic medication synthesized from thebaine. It is a Schedule II controlled substance both as a single agent and in combination with other products such as acetaminophen, ibuprofen, or asprin.

[2] Hydrocodone is a narcotic which relieves pain by binding to opioid receptors in the brain and spinal cord. Pure hydrocodone, and forms containing more than 15 mg per dosage unit, are Schedule II controlled substances. Tablets consisting of less than 15 mg hydrocodone per dosage unit constitute hydrocodone bitartrate and are Schedule III controlled substances. For purposes of this affidavit, all references to "hydrocodone" refer to "hydrocodone bitartrate."

1   San Diego Police Department ("SDPD") and other law enforcement officers. The evidence and
2   information contained herein was developed from a review of intercepted wire and electronic
3   communications pursuant to prior district court authorization, interviews with sources of information,
4   financial documents secured by grand jury subpoena, surveillance records, vehicle records from the
5   California Department of Motor Vehicles ("DMV"), and public records.

6                                    **EXPERIENCE AND TRAINING**

7       5.      I have been employed as a Special Agent with the FBI for over six years. I am currently
8   assigned to the San Diego Field Division working as a member of the San Diego Organized Crime
9   Squad. I have received 16 weeks of training at the FBI Academy in Quantico, Virginia. During the
10  training, I learned how controlled substances are manufactured, consumed, packaged, marketed, and
11  distributed. I have interviewed and operated informants, executed search warrants, arrested and
12  interviewed subjects, conducted physical surveillance, utilized electronic and video surveillance. I have
13  also worked with and consulted numerous agents and law enforcement officers who have investigated
14  drug trafficking.

15      6.      In the course of my law enforcement experience, I have participated in investigations of
16  crimes involving the importation and illegal distribution of controlled substances and money laundering.
17  I have arrested and participated in the arrests of numerous individuals for various controlled substance
18  violations. I have participated in the execution of search warrants relating to illegal drug offenses. I
19  have received training in the methods used by drug traffickers to import and distribute controlled
20  substances and launder drug proceeds to promote the drug trafficking activity and conceal or disguise
21  the nature, source, and ownership of the drug proceeds. I have conducted and participated in numerous
22  investigations involving surveillance of individuals associated with drug trafficking. I have conducted
23  and participated in numerous interviews of individuals involved with drug trafficking.

24      7.      Based upon my experience and training, consultation with other law enforcement officers
25  experienced in controlled substances, health care fraud, and financial investigations, and all the facts
26  and opinions set forth in this affidavit, I know that:

27              a.      The target location, WHITE CROSS DRUG STORE, is a "controlled premises"
28  within the meaning of 21 U.S.C. §§ 880(a) and 21 C.F.R.§ 1316(c). Pursuant to its registration, the

2

1  pharmacy is authorized to handle controlled substances in Schedules II, IIN, III, IIIN, IV and V. The

2  pharmacy is required to keep complete and accurate records of all controlled substances received, sold,

3  delivered, or otherwise disposed of pursuant to 21 U.S.C. §§ 827, and 21 C.F.R. § 1304.01 et seq., on

4  the controlled premises.

5        b.    Based on prior searches I believe I will find articles of personal property

6  evidencing the identity of persons occupying, possessing, owning, frequenting or controlling the

7  premises or property therein.

8        c.    Pharmacies often use computers for the storage of business records and for

9  communication between employees, customers and suppliers, by means of electronic mail ("e-mail").

10  Moreover, I know that digital evidence can be stored on a variety of systems and storage devices

11  including: hard disk drives, floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magneto optical

12  cartridges, personal digital assistance, pagers, money chips, thumb drives, flash drives, and portable hard

13  drives. Therefore, I am requesting permission to seize computers, including printers, monitors,

14  keyboards, scanners, and all forms of media storage that may be found on the premises.

15        d.    Persons involved in illegal drug distribution often forge prescriptions and/or

16  manipulate computer information and records in order to conceal the distribution of controlled

17  substances.

18        8.    It is my opinion and belief that the seizure of such records will provide evidence of the

19  events set forth in this affidavit and that such records can be found at the target location despite any

20  lapse of the time between the events described and the anticipated search pursuant to this warrant.

21        9.    This investigation has focused on criminal activities occurring at three pharmacies

22  located in San Diego (collectively referred to as "the three pharmacies"): (1) GALLOWAY

23  PHARMACY, (2) PARK BOULEVARD PHARMACY, and (3) WHITE CROSS DRUG STORE (the

24  target location). The three pharmacies are owned and operated by Fadi ATIYA, Ramsey ATIYA, and

25  Akram ATIYA. Fadi ATIYA is the owner, president and Pharmacist-in-Charge of GALLOWAY

26  PHARMACY. Fadi ATIYA is also the vice president of PARK BOULEVARD PHARMACY and

27  president of WHITE CROSS PHARMACY. Ramsey ATIYA is the secretary for both PARK

28  BOULEVARD PHARMACY and WHITE CROSS DRUG STORE. Akram ATIYA, is listed as

3

president of PARK BOULEVARD PHARMACY and Vice President for WHITE CROSS DRUG STORE. Given the common ownership and management of the three pharmacies, it is unclear whether some of the records for one pharmacy may be found at another pharmacy. The investigation has revealed that the illegal diversion and distribution of controlled substances from the three pharmacies has been substantial and has continued for years. Consequently, there will be historical records relevant to the diversion and distribution of controlled substances from the three pharmacies found at the target location as well as evidence relevant to money laundering.

## OVERVIEW OF THE TARGET SUBJECTS

10.    The following is a brief description of Ahmad H. HNAINO, Youssef HABHAB, Jose Jesus Peruch SAENZ, Jesus MACIAS, and Karl MURRAH, the target subjects whose drug trafficking activities provide probable cause for the search warrants on the three pharmacies.

a.    **Ahmad H. HNAINO** (hereinafter "HNAINO") is the current Pharmacist-in-Charge at WHITE CROSS DRUG STORE. Prior to November of 2007, HNAINO was the Pharmacist-in-Charge at PARK BOULEVARD PHARMACY. HNAINO is the brother-in-law of Youssef HABHAB.

b.    **Jose Jesus Peruch SAENZ** (hereafter "SAENZ") is a pharmacy technician at GALLOWAY PHARMACY who is in charge of ordering pharmaceuticals. On February 22, 2008, SAENZ was indicted in two separate cases, Criminal Case No. 08CR0509-BEN and Criminal Case No. 08CR0511-BEN, and charged with conspiracy to distribute oxycodone and hydrocodone in violation of 21 U.S.C. §§ 846 and 841(a)(1), and multiple counts of distribution of oxycodone and hydrocodone in violation 21 U.S.C. § 841(a)(1).

c.    **Jesus MACIAS**, aka "Jessie" (hereafter "JESUS") is a pharmacy technician at GALLOWAY PHARMACY. JESUS used his position as a pharmacy technician to obtain and sell distributable quantities of oxycodone and hydrocodone. JESUS distributed oxycodone and hydrocodone to his brother JUAN and others for further distribution. On February 22, 2008, JESUS and JUAN were indicted in Criminal Case No. 08CR0509-BEN and charged with conspiracy to distribute oxycodone and hydrocodone in violation of 21 U.S.C. §§ 846 and 841(a)(1), and multiple counts of distribution of oxycodone and hydrocodone in violation 21 U.S.C. § 841(a)(1).

4

d.    **Youssef Mustapha HABHAB** (hereinafter "HABHAB") distributed large quantities of hydrocodone while employed at PARK BOULEVARD PHARMACY. HABHAB indicted in Criminal Case No. 08CR0404-BEN and charged with distribution of hydrocodone in violation 21 U.S.C. § 841(a)(1).

e.    **Karl DeLeon MURRAH** (hereafter "MURRAH") received large quantities of pharmaceuticals from SAENZ from at least February 2007 through August 2007 and then sold the pharmaceuticals to other individuals for further distribution. MURRAH is charged with six others in Criminal Case No. 08CR0511-BEN with conspiracy to distribute oxycodone and hydrocodone in violation of 21 U.S.C. §§ 846 and 841(a)(1), and distribution of hydrocodone in violation 21 U.S.C. § 841(a)(1). MURRAH is also charged with conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1) and with distribution of MDMA (Ecstasy), and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1).

## FACTS ESTABLISHING PROBABLE CAUSE

### Diversion from GALLOWAY PHARMACY by SAENZ

11.    In late 2003, an investigation was initiated into MURRAH's drug trafficking activities. An undercover DEA agent ("UC") purchased approximately 250 ecstasy pills from MURRAH during 2003.

12.    On December 7, 2006, the UC met with MURRAH in National City, California and asked MURRAH whether he was still moving "X" [ecstasy]. MURRAH stated that he moved to "meds" [pharmaceuticals] such as "OxyContin" [a brand name for oxycodone] and "Vicodin" [a brand name for hydrocodone]. MURRAH said that you can move a lot of "meds" because the demand was there. MURRAH also said that there was lots of money in that area of business.

13.    On January 4, 2007, the UC met with MURRAH at a local restaurant in San Diego. MURRAH confirmed that he was currently involved in the distribution of pharmaceuticals such as OxyContin and Vicodin. MURRAH said that he made a lot of money selling pharmaceuticals by transporting large amounts of it to the East Coast. MURRAH indicated that there was a low supply of OxyContin and that Vicodin was currently in high demand. MURRAH told the UC that the UC should

5

begin to do his business by doing his homework and starting a line of clients. MURRAH said that a good client base could be found on the local college campuses.

14.    On February 1, 2007, agents initiated a Federal Title III wire tap investigation of Karl MURRAH. In 2007, agents initiated a Title III investigation of MURRAH. On February 22, 2007, wire interceptions indicated that MURRAH planned to meet with his source of supply and receive pharmaceuticals. Agents were able to observe the meeting between MURRAH and his source of supply -- who was subsequently identified as SAENZ. During this meeting agents observed SAENZ transfer a box into the trunk of MURRAH's vehicle.

15.    On March 8, 2007, undercover agents purchased four bottles of hydrocodone, each containing 500 tablets, from MURRAH. During this transaction, MURRAH produced a sealed box, similar to the box from the February 22, 2007 transaction. MURRAH opened the sealed box, which contained several bottles of hydrocodone tablets, and gave four of the bottles to the undercover agents. The pharmaceuticals obtained by the undercover agents from MURRAH were in their original commercial bottles with seals and labels intact.

16.    On March 19, 2007, agents conducted a trash search of MURRAH's residence, 897 Yosemite Dr, Chula Vista, California. Among the evidence obtained from the trash at MURRAH's residence, agents found two empty boxes similar to the boxes previously mentioned from February 22, 2007, and March 19, 2007, and an empty commercial hydrocodone bottle of the same type, and from the same manufacturer (500 count bottle, Watson brand Hydrocodone Bitartrate and Acetaminophen), purchased by the undercover agents on March 8, 2007.

17.    Also on March 19, 2007, agents conducted a trash search of SAENZ's residence, 2825 Red Rock Canyon Drive, Chula Vista, California. Among the evidence obtained from the trash at SAENZ's residence, agents found three empty commercial hydrocodone bottles (one bearing a GALLOWAY PHARMACY inventory sticker) of the same type, and from the same manufacturer (500 count bottle, Watson brand Hydrocodone Bitartrate and Acetaminophen), purchased by the undercover agents on March 8, 2007.

18.    On June 20, 2007, agents observed SAENZ, in the GALLOWAY PHARMACY employee parking lot, place a box [similar to the boxes mentioned above from February 22, 2007, March

6

8, 2007, and March 19, 2007] into the trunk of his vehicle.    Agents followed SAENZ and the vehicle he placed the box into and observed SAENZ drive from GALLOWAY PHARMACY to his residence.

19.    Based upon these intercepted calls and text messages, agents believe that, from February 2007 to approximately August 2007, SAENZ distributed at least 90,000 hydrocodone tablets and at least 400 oxycodone tablets to MURRAH for further distribution.

**Diversion from GALLOWAY PHARMACY by Jesus MACIAS**

20.    During approximately May of 2007, a confidential source of information (CI-1)[3/] met Juan Ernesto MACIAS, Jr. (hereafter "JUAN") – Jesus MACIAS' brother – while playing poker at a friend's house in San Diego, California.    During their conversation, JUAN told CI-1 that he could supply CI-1 with bottles of 500 hydrocodone tablets. CI-1 then asked JUAN how much it would cost per bottle. JUAN responded $700 per bottle. The two then exchanged telephone numbers. CI-1 told JUAN to call CI-1 when JUAN wanted to "do business."

21.    On July 14, 2007, agents intercepted a text message from SAENZ to JESUS that said: "HEY . . . IT NEVER CAME IN . . . WHO DID YOU ORDER IT FROM?" Agents believe that, in this text message, SAENZ told JESUS that an order of pharmaceuticals (previously ordered by JESUS) did not arrive at Galloway Pharmacy and that SAENZ wanted to check on the status of the order.

22.    On July 18, 2007, agents intercepted a text message from JESUS to SAENZ.    In the text message, JESUS asked: "HEY WHAT'S UP WITH THE YELLOWS [hydrodocone tablets]? DID THEY COME IN?"

23.    On July 20, 2007, JUAN called CI-1 and said that he was ready to "do business." JUAN then clarified that he had "those yellow [hydrocodone] pills." CI-1 met with JUAN at Fashion Valley Mall in San Diego, California and JUAN showed CI-1 a bottle containing hydrocodone and another

---

[3/]    CI-1 pled guilty to felony drug charges in state court and is awaiting sentencing. On April 17, 2007, CI-1 entered into a Cooperation Agreement with the FBI and the San Diego District Attorney's Office. Pursuant to the agreement, CI-1 agreed to plead guilty to felony charges in state court and assist law enforcement in return for a possible reduction in sentencing. On November 26, 2007, the San Diego District Attorney's Office concluded the Cooperation Agreement by telling CI-1 that CI-1 will not receive any further punishment for his/her state felony charges as a result of the cooperation the CI had provided thus far. CI-1 then entered into a second Cooperation Agreement with the FBI and the San Diego District Attorney's Office. Pursuant to the second Cooperation Agreement, CI-1 agreed to continue to assist law enforcement in return for a reduction of his/her felony state charges to a misdemeanor. As of December 5, 2007, CI-1 has been reimbursed $2,100 by the FBI for his/her expenses. The information provided by CI-1 has been corroborated and has proven to be reliable.

bottle containing 80 milligram tablets of OxyContin (a brand of oxycodone). JUAN told CI-1 that he wanted $2,500 per bottle of OxyContin. JUAN also told CI-1 that he wanted $700 per bottle of hydrocodone if the bottle belonged to him, and $1,000 if the belonged to his brother. JUAN told CI-1 that his brother (JESUS) worked at a pharmacy in San Diego, California.

24.    On July 25, 2007, agents intercepted a text message from JESUS to SAENZ. In the text message, JESUS asked: "HEY ARE YOU ABLE TO ORDER ME 4 BOTTLES OF THE YELLOW [hydrocodone tablets]? THROUGH VALLEY? I'M NOT WORKING FRIDAY OR SAT. THAT IS WHY." [Agents believe that "VALLEY" refers to Valley Wholesale Drug Co., Inc., a pharmaceutical distributor. Telephone toll records for the GALLOWAY PHARMACY phone number indicate multiple contacts between GALLOWAY PHARMACY and Valley Wholesale Drug Co., Inc., between July 24 and July 27, 2007].

25.    On July 27, 2007, JUAN sold two bottles of oxycodone (each bottle containing 100 tablets of 80 mg of oxycodone tablets) and two bottles hydrocodone (each bottle containing 500 tablets) to the CI for $5,000. JUAN also provided CI-1 with a small bottle that contained 18 hydrocodone tablets. After the controlled purchase was completed, agents observed JUAN meet with JESUS.

26.    On September 26, 2007, CI-1 met with JESUS and JUAN at the Oceanaire Restaurant in the Gas Lamp District of San Diego to discuss future pharmaceutical transactions. JESUS said he could provide CI-1 with two to four boxes of hydrocodone every couple of weeks and said that he would do his best to obtain oxycodone.

27.    On September 29, 2007, JESUS sold two bottles of oxycodone (each bottle containing 100 80 mg tablets) and eight bottles of hydrocodone (each bottle containing 500 10mg tablets) to CI-1.

28.    On October 6, 2007, monitors intercepted a series of calls from ISABEL QUISTIAN, III ("QUISTIAN") to JESUS which indicated that JESUS planned to distribute pharmaceuticals to QUISTIAN. During the call, QUISTIAN asked JESUS, "What's the dealio?" JESUS later responded, "One or two." QUISTIAN further inquired, "One or two of the 80's [one or two bottles containing 80 mg tablets of oxycodone]?" JESUS responded, "Yes."

29.    On October 7, 2007, at approximately 11:30 a.m., agents conducted surveillance at the target location when they observed QUISTIAN's black GMC sport utility vehicle arrive at the residence. Approximately 18 minutes later, QUISTIAN's vehicle was observed leaving the vicinity of JESUS and JUAN's residence.  Surveillance of the vehicle was maintained until a SDPD unit conducted a traffic stop of QUISTIAN's vehicle for failing to signal while turning.  During an inventory search of the vehicle, officers found three bottles of oxycodone (each containing 100 80mg tablets), two regular-sized bottles of hydrocodone (each containing 500 5mg tablets), and  two large bottles of hydrocodone (each containing 1,000 10mg tablets).

30.    On October 12, 2007, JESUS sold four bottles of oxycodone (each containing 100 80 mg tablets) and four bottles of hydrocodone (each containing 500 10 mg tablets) to CI-1 for $14,000.

31.    On October 13, 2007, monitors intercepted a call between JESUS and JUAN.  During the call, JESUS told JUAN, "Bring all that stuff [from the garage] in[side the house].  The paperwork and then my yellows [bottles of hydrocodone], put them in my closet . . . ."  Later in the conversation, JESUS told JUAN, "Yeah, and I got you uh 3,000 yellows [hydrocodone], 1,000 of the white Vicodins five by five hundred [hydrocodone] and one 80 [one bottle of 80 mg oxycodone.]."

32.    On December 3, 2007, JESUS sold three bottles of oxycodone (each containing 100 80 mg tablets) to CI-1 for $7,500.  The controlled purchase took place at the target location and both JESUS and JUAN were present during the deal.

33.    On January 23, 2008, JESUS sold two bottles of oxycodone (each containing 100 80 mg tablets) to CI-1 for $5,000.  The controlled purchase took place at the target location and both JESUS and JUAN were present during the deal.    During the deal, CI-1 inquired how JESUS could obtain the pharmaceuticals.  The CI asked whether JESUS had a "hook up" [with the wholesalers]. JESUS responded "somewhat."  JESUS stated that they just "over-order."  The CI asked what happens if someone looked over the orders.  JESUS replied, "if they do I'm fucked."  JESUS further explained that they only go over the orders when the orders are massive.  JESUS said that if "the company" [believed to refer to the wholesaler] noticed a big change in the ordering pattern then they will send an e-mail to Fadi Atiya asking what is happening.  That is why JESUS can order "one a week."

34.    On January 26, 2008, monitors intercepted a call between JESUS and JUAN regarding bottles of oxycodone that were stored at the target location. During the call, JESUS told JUAN, "I left two eighties [two bottles containing 80 mg tablets of oxycodone] right there in my room, in the Gucci shoe box." JUAN then asked, "How many?" JESUS then confirmed, "Two . . ." Jesus then stated, "I'll probably get on more today."

**Diversion from PARK BOULEVARD PHARMACY by HABHAB**

35.    On May 31, 2007, CI-1 called HABHAB and invited him to a barbecue. While at the barbecue, HABHAB asked CI-1 whether he/she needed any "yellows" [hydrocodone tablets]. CI-1 confirmed that he/she did want to purchase bottles of yellows. HABHAB handed eight yellow hydrocodone tablets to CI-1 as a personal gift until the bottles were available.

36.    On June 11, 2007 at approximately 5:42 p.m., CI-1 called HABHAB and left a message to call back. At approximately 7:33 p.m., HABHAB returned CI-1's call and the two made arrangements to meet. At approximately 7:44 p.m., CI-1 met with HABHAB and purchased three bottles of hydrocodone (a total of 1,500 tablets) for $4,500.

37.    On June 12, 2007, CI-1 called HABHAB and asked if HABHAB had "three yellers" [three bottles of hydrocodone tablets]. HABHAB acknowledged and then told CI-1 that he would call CI-1 later. CI-1 and HABHAB then arranged to purchase the drugs the next day.

38.    On June 13, 2007, CI-1 purchased three bottles of hydrocodone tablets from HABHAB for $4,500.

39.    On June 20, 2007, CI-1 purchased five bottles of hydrocodone tablets from HABHAB for $7,200.

40.    On July 17, 2007, CI-1 made a recorded call to HABHAB. HABHAB asked CI-1 if he/she wanted to purchase any regular "t-shirts" [bottles of hydrocodone tablets]. CI-1 told HABHAB that he/she had "cheddar" [money] to purchase "the other t-shirts" [OxyContin]. HABHAB told CI-1 that he would see what he could do.

**Diversion from WHITE CROSS DRUG STORE by HNAINO**

41.    On February 25, 2008, a confidential source of information ("CI-2")[4/] advised special agents of the FBI that HNAINO has illegally distributed large quantities of oxycodone and hydrocodone bitartrate to a customer since at least September 2007. HNAINO is the Pharmacist-in-Charge at White Cross Drug Store in San Diego, California and is licensed to distribute pharmaceuticals to individuals who have a valid medical prescription.

42.    CI-2 does not have a license to distribute pharmaceuticals and has delivered the oxycodone and hydrocodone bitartrate to the customer on HNAINO's behalf, and obtained money from the customer for prior drug deliveries which was delivered by CI-2 to HNAINO. CI-2 advised agents that CI-2 had made deliveries of hydrocodone obtained from HNAINO to the customer on approximately a monthly basis since on or about September of 2007. The customer's usual order consisted of six bottles of 10 mg hydrocodone (500 tablets per bottle), and six bottles of 5 mg hydrocodone (500 tablets per bottle). During that same period, on approximately four or five occasions, CI-2 delivered oxycodone obtained from HNAINO to the customer along with the hydrocodone. The customer's usual order of oxycodone consisted of five bottles of 80 mg oxycodone (100 tablets per bottle).

43.    On February 26, 2008, CI-2 called HNAINO and told him that the customer wanted more oxycodone and hydrocodone bitartrate. CI-2 further advised HNAINO that the customer had the $15,000 the customer owed HNAINO for previous drug purchases. HNAINO agreed to obtain the drugs and advised the CI that HNAINO would call later that day or the next day.

44.    On February 28, 2008, CI-2 called HNAINO regarding the status of the order. HNAINO advised CI-2 that he could provide the bottles of hydrocodone tablets to CI-2 that day but would not be able to get the oxycodone tablets to CI-2 until the next day. CI-2 and HNAINO agreed that the CI would take delivery of the drugs on February 29, 2008. CI-2 would then deliver the drugs to the customer and obtain the $15,000 owed by the customer to HNAINO, which CI-2 would then deliver to HNAINO.

---

[4/]    CI-2 has been arrested but has no known criminal convictions. The information provided by CI-2 has been corroborated and has proven to be reliable.

45.    On February 29, 2008, CI-2 met with the defendant in a parking lot located at 8730 Rio San Diego Drive, San Diego, California. HNAINO removed two plastic bags with the name "Good Neighbor Pharmacy" from his vehicle and handed them to CI-2 who placed the bags in the back of the CI-2's vehicle.    FBI Special Agents recovered the bags that were placed into CI-2's vehicle and determined that each bag contained six sealed bottles of Watson brand hydrocodone bitartrate tablets, with 500 tablets per bottle – a total of 6,000 tablets of hydrocodone bitartrate.    Agents also found a white paper bag (also bearing the name "Good Neighbor Pharmacy") that contained four sealed bottles of Purdue Pharma brand 80 mg oxycodone tablets, with 100 tablets per bottle, and one bottle of Purdue Pharma brand 80 mg oxycodone tablets with the seal broken, which contained 77 tablets.

46.    Approximately two hours after HNAINO distributed the drugs, HNAINO met with CI-2 near a coffee shop in La Jolla, California. HNAINO got into CI-2's vehicle and CI-2 handed a white envelope that contained $15,000 in United States currency to HNAINO. HNAINO then got out of CI-2's vehicle carrying the white envelope with the $15,000 which HNAINO placed in his green Saab.

**Pharmaceutical Purchase and Distribution Data for the three pharmacies**

47.    The Automation of Reports and Consolidated Orders System ("ARCOS") is a computer system that enables the Government to maintain a current and historical record of selected controlled substance inventories from the point of manufacture to the point of sale, distribution, or other disposition, and finally to the dispensing (consumption) level. The Controlled Substance Utilization Review and Evaluation System ("CURES") is computer system that monitors the number of prescriptions in California. DEA Diversion Investigators compare ARCOS records (related to the amounts of controlled substances purchased by a pharmacy) with CURES records (related to the number of legitimate prescriptions submitted to a pharmacy) to determine whether there was a meaningful discrepancy. The discrepancy between purchase and prescription records may be explained (at least in part) by the diversion of controlled substances by individuals inside the pharmacy.

• **GALLOWAY PHARMACY**

48.    Based on a review of ARCOS reports, GALLOWAY PHARMACY was the 11th largest purchaser of hydrocodone in the State of California in 2006 at 1,422,400 dosage units and the 33rd largest purchaser in 2007 at 884,800 dosage units. ARCOS reports indicate that there was a dramatic increase in the amount of hydrocodone purchased by GALLOWAY PHARMACY over the past five years. GALLOWAY PHARMACY purchased 308,100 dosage units of hydrocodone in 2003; 345,760 dosage units in 2004, and 766,600 dosage units in 2005.

49    ARCOS reports indicate that, between July 1, 2007, and October 1, 2007, GALLOWAY PHARMACY purchased 193,600 hydrocodone tablets and 7,000 OxyContin tablets. CURES indicates that, between July 1, 2007 and October 1, 2007, GALLOWAY PHARMACY filled prescriptions totaling 54,907 hydrocodone tablets and 4,688 OxyContin tablets. Consequently, during the time period evaluated, approximately 72% of the hydrocodone tablets and 33% of the OxyContin tablets purchased by GALLOWAY PHARMACY cannot be accounted for by the prescriptions filled by the pharmacy. This comparison does not account for what would expected to be relatively small differences in the amounts of hydrocodone and Oxycontin on the shelves at GALLOWAY PHARMACY on July 1, 2007, versus October 1, 2007. The large discrepancy between the amounts of hydrocodone and OxyContin purchased by GALLOWAY PHARMACY during the time frame evaluated is consistent with the information provided above indicating that large amounts of controlled substances are being diverted from the pharmacy.

- **PARK BOULEVARD PHARMACY**

50.    ARCOS reports indicate that between September 1, 2007, and December 31, 2007, PARK BOULEVARD PHARMACY purchased a total of 89,200 hydrocodone tablets and 5,000 OxyContin tablets (80 mg oxycodone tablets). CURES indicates that, between September 1, 2007 and December 31, 2007, PARK BOULEVARD PHARMACY filled prescriptions for a total of 41,987 hydrocodone tablets and 1,560 OxyContin tablets. The data above indicate that over the time period evaluated, approximately 53% of the hydrocodone tablets and 69% of the OxyContin tablets purchased by PARK BOULEVARD PHARMACY cannot be accounted for by the prescriptions filled by the pharmacy. This comparison does not account for what would expected to be relatively small differences in the amounts of hydrocodone and OxyContin on the shelves at PARK BOULEVARD PHARMACY

on September 1, 2007, versus December 1, 2007. The large discrepancy between the amounts of hydrocodone and Oxycontin purchased by PARK BOULEVARD PHARMACY during the time frame evaluated is consistent with the information provided above indicating that large amounts of controlled substances are being diverted from PARK BOULEVARD PHARMACY.

- **WHITE CROSS DRUG STORE**

51.    The ARCOS reports indicate that, between September 1, 2007 and December 31, 2007, WHITE CROSS DRUG STORE purchased a total of 167,300 hydrocodone tablets and 7,400 OxyContin tablets (80 mg oxycodone tablets). CURES indicates that, between September 1, 2007 and December 31, 2007, WHITE CROSS DRUG STORE filled prescriptions for a total of 31,245 hydrocodone tablets and 2,795 OxyContin tablets. The data above indicate that over the time period evaluated, approximately 81% of the hydrocodone tablets and 62% of the Oxycontin tablets purchased by WHITE CROSS DRUG STORE cannot be accounted for by the prescriptions filled by the pharmacy. This comparison does not account for what would expected to be relatively small differences in the amounts of hydrocodone and OxyContin on the shelves at WHITE CROSS DRUG STORE on September 1, 2007, versus December 1, 2007. The large discrepancy between the amounts of hydrocodone and OxyContin purchased by WHITE CROSS DRUG STORE during the time frame evaluated is consistent with the information provided above indicating that large amounts of controlled substances are being diverted from WHITE CROSS DRUG STORE.

52.    The ARCOS data for the three pharmacies is based on information provided by pharmaceutical distributors. The CURES data reported above is based on information provided by the three pharmacies themselves. As noted above, comparisons of ARCOS and CURES data with regard to a given pharmacy cannot be considered a substitute for a complete audit of actual pharmacy records regarding the purchase and dispensation of controlled substances. Pursuant to the execution of the search warrant at the target location, duly authorized Diversion Investigators of the DEA will be present to conduct an audit to establish a full and complete accountability for all regulated equipment and all controlled substances received, compounded, dispensed, and disposed of by the registrant pharmacy.

14

## SEARCH PROTOCOL FOR COMPUTERS

53.    This section describes the procedures that will be employed during this search to minimize the intrusion represented by the search of any electronic data found at the target location.

54.    Searching agents will be asked to use an incremental approach in searching for relevant electronic material.  If the agents are able to examine relevant portions of computer drives to identify responsive material within a reasonable time period on-site, then the agents will attempt to create forensic images of computers or laptops seized. However, if the agents cannot perform the search within a reasonable period on-site, will they employ alternate procedures to complete the review off-site.  In that case, the computer expert will create forensic images of electronic data sources as necessary to complete the search off-site.

55.    A forensic image is an exact physical copy of a computer hard drive or other similar electronic storage media.  A forensic image thus captures all of the data on the hard drive (or other media) without the data being viewed and without changing the data in any way. There are many reasons why it is not feasible to conduct a forensic analysis of data on-site. First, analysis of the data following the creation of the forensic image is a highly technical process that requires specific expertise, equipment and software. Second, there are literally thousands of different hardware items and software programs that can be commercially purchased, installed and custom-configured on a user's computer system.  Third, it is only after a thorough examination and analysis, that a trained computer forensic examiner can determine whether he needs to obtain specialized hardware or software (not to mention specialized training on the specialized software) in order to view and analyze the data contained in electronic form.

56.    The analysis of data on a computer may also be an extremely tedious and time consuming process.  In addition, to requiring special technical skills, equipment and software, it may take days to properly search a single hard drive for specific data.  With current technology, each search "hit" must be reviewed in its context by an agent to determine whether the data is within the scope of the warrant.  In other words, merely finding a good "hit" does not end the review process.

15

57.    Analyzing data on-site has become increasingly impossible as the volume of data stored on a typical computer system has increased. For example, a single gigabyte of storage space (i.e., 1,000 megabytes) is the equivalent of 500,000 double-spaced pages of text. Computer hard drives capable of storing 100s of gigabytes of data are becoming quite common in newer desktop computers.

58.    In addition to the sheer volume, the data may be stored in a variety of formats or encrypted. The volume of data of course extends the time that it takes to analyze the image in a laboratory. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. Moreover, certain file formats do not lend themselves to keyword searches (e.g., many common electronic mail, database and spreadsheet applications do not store data as searchable text).

59.    Based on the foregoing, searching any computer or forensic image for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may require off-site analysis.

60.    Nevertheless, all forensic analysis of the imaged data will be directed exclusively to the identification and seizure of information within the scope of this warrant. In the course of proper examination, the forensic examiner may view information that is potentially privileged or not within the scope of the warrant. If so, this information will not be made available to the investigating agents unless it appears to the examiner that the information relates to the commission of offenses not covered by this warrant. In that event, the examiner will confer with the investigator and/or the prosecuting attorney so that they can determine whether to seek a further search warrant for the newly uncovered data.

61.    All seized computers shall be returned to the defendants or the defendant's agent within 10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the Government will seek from the Court an extension of time within which to return the applicable devices and/or equipment.

## CONCLUSION AND SEALING REQUEST

62.    Based on my training and experience, consultation with other special agents and law enforcement officers, and all of the facts and opinions set forth in this affidavit, there is probable cause to believe that federal crimes have been committed, including controlled substances violations under 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and money laundering offenses under 18 U.S.C. § 1956. There is also probable cause to believe that property constituting evidence of the offenses, contraband, fruits of crime or things otherwise criminally possessed, and property designed or intended for use or which is or has been used as a means of committing the criminal offenses will be found in the target location described further in Attachment A.

63.    Because this is an ongoing investigation and premature disclosure of the investigation could endanger agents and officers, cause the target subjects and others to flee and cause destruction of evidence, I request that this affidavit, the application for the search warrant, the search warrant, and all other associated court records be sealed until further court ordered.

I declare under penalty of perjury that the foregoing is true and correct.


GERALD K. COOK
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this ____ day of March, 2008.


HONORABLE CATHY ANN BENCIVENGO
United States Magistrate Judge

17